*Bank of America, N.A. v. O'Kelly*, 314-5-15 Wncv (Teachout, J., May 6, 2019)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**
**Washington Unit**

**CIVIL DIVISION**
**Docket #314-5-15 Wncv**

**BANK OF AMERICA, N.A.**

**v.**

**SEAMUS P. O'KELLY, et al.**

## DECISION ON REMAND
### Plaintiff's Motion to Void Foreclosure Sale

In this foreclosure case, after a sale was held, Plaintiff moved to void the sale. The court denied the motion and confirmed the sale to the bidder at the sale. Plaintiff appealed, and in an Opinion filed July 27, 2018, the Vermont Supreme Court remanded the case to this court for further proceedings consistent with the opinion.

The court held a further evidentiary hearing on the Plaintiff's motion to void the sale, with notice to the original mortgagors. The hearing was held on February 14, 2019. By agreement of the parties, all evidence from the original hearing on the motion (May 11, 2017) was included in the form of a transcript from that hearing. Additional evidence was also heard. Present were Attorney for Plaintiff William R. Dziedzic, Mortgagor Seamus P. O'Kelly, Intervenor Sandra Lockerby, and Attorney for Intervenor John P. Riley.

Based on the evidence and the record and pursuant to the Supreme Court opinion, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

The property at issue is a single-family residence on two acres located in a rural area in the Town of Berlin. It was owned by Seamus and Jennifer O'Kelly who acquired it in 1999 and mortgaged it in 2002 for $109,135.00. The loan was guaranteed by the Department of Veterans Affairs. As of 2008, it was well maintained, the mortgage was up to date, and there was equity in the property. Seamus O'Kelly left for Afghanistan and was gone two years. When he returned to the United States, he was divorced. He did not return to the property. The divorce decree awarded the property to Jennifer O'Kelly. It was still subject to the loan and mortgage. He did not check to see whether Jennifer had refinanced to remove his obligation on the mortgage loan. He was last on the property in 2008.

At some unknown time, Jennifer O'Kelly moved out of the property and it has apparently been vacant since. It is located partway up Muzzy Road, which ends in a dead end. A driveway shared with another property leaves Muzzy Road and leads to the house, which is visible from Muzzy Road.

Sandra Lockerby lives in the last house on Muzzy Road before the dead end, approximately one-half mile past the property. She drove by it every day and observed that it was vacant and unmaintained for about 4–5 years. The grass was not cut and the lawn reverted to a condition that it could no longer be cut with an ordinary mower.

Plaintiff brought this foreclosure case in 2015. Both Seamus O'Kelly and Jennifer O'Kelly were served with the summons, complaint, and related documents. Mr. O'Kelly believed that he had no liability based on the divorce decree that awarded the house and responsibility for the loan to Jennifer. He took the papers he was served with to Jennifer for her to deal with and did not file an appearance in the lawsuit. Jennifer also filed no appearance in the lawsuit. A motion for default judgment was granted and a Judgment and Decree issued on December 7, 2015 that called for redemption by June 8, 2016 and a sale within 6 months thereafter if no redemption occurred.

There was no redemption, and Plaintiff arranged for a judicial sale to take place on August 23, 2016. Pursuant to paragraph 7 of the Judgment and 12 V.S.A. § 4953(b), the sale was adjourned to September 19, 2016.[1]

Sandra Lockerby intended to bid at the sale, and on September 14, 2016, she obtained a bank check in the amount of $10,000 in order to be able to submit the deposit required under paragraph 7 of the Judgment.

On September 16th, 3 days before the sale, Plaintiff filed an emergency motion with the court seeking to cancel the sale scheduled for September 19th in order to obtain more time to resolve a pending insurance claim related to damage to the property. The motion was granted the same day. The reason for the requested continuance implies that prior to this date, there had been damage to the property sufficient to warrant an insurance claim, although specifics are unknown. In the Plaintiff's affidavit of amounts due dated August 13, 2015, Plaintiff shows an item for "Property Preservation" of $1,791.40, though there is no information about what the funds were used for or the basis or necessity of the expense. It is also unclear whether the insurance claim is related.

On September 19th, Sandra Lockerby and a few other potential bidders were at the property at the scheduled time for the foreclosure sale. No one appeared to conduct a

---

[1] 12 V.S.A. § 4953(b) provides that a sale may be adjourned for up to 30 days without court order by "announcement of the new sale date to those present at each adjournment or by posting notice of the adjournment in a conspicuous place at the location of the sale." There is no evidence confirming that the adjournment took place in compliance with these requirements, but the court assumes that it did, as bidders appeared at the adjourned date and time.

sale, and there was no notice posted of the cancellation. After waiting a while beyond the scheduled time, Ms. Lockerby and the others left. She called a Plaintiff's representative to find out when the sale would be held and was told that she would just have to watch the paper.

Notice of the sale was apparently published for a sale to be held on December 8, 2016 at 10:00 am. Ms. Lockerby checked with the bank where she had obtained the banker's deposit check in September to make sure that it would still be good and found that it was. She arrived at the property before the scheduled time. The auctioneer arrived about the same time. She was not allowed to go inside the house to see its condition. As a result of her own investigation and observation, she knew that it had been vacant and unmaintained for 4–5 years. She had learned from talking to a service person that she had seen go inside that there were problems with water pipes and mold. She knew that if she wanted to bid she would have to accept the risk of damage in the interior to an unknown extent.

That day, December 8th, the auctioneer, Andrew Leith, knew that he had a 10:00 am judicial sale to conduct in Berlin. He received the papers electronically from Plaintiff's attorney's office around 8:30 that morning and had to find the property location and get to it in time to conduct the sale. The packet he had received electronically did not have his name on it but had the name of a different auctioneer on it despite the fact that it was sent to him. One of the documents appeared to authorize the different auctioneer to enter a bid of $120,000 on Plaintiff's behalf. Mr. Leith did not know whether or not he personally was being authorized to enter a bid on the Plaintiff's behalf, or whether such a procedure would be acceptable to the court, as he knew that it may not be. He did not know whether or not a Plaintiff's representative was coming to the auction. He drove to the property and arrived in advance of the 10:00 am sale time.

The Plaintiff had hired a representative to attend the sale and enter a bid on its behalf. She had the correct address but she apparently did not allow enough time. She had trouble with a GPS system and when she got to Muzzy Road, she did not find the house, although it was visible from Muzzy Road. She abandoned her search for the property and never arrived at the sale.

The auctioneer and Ms. Lockerby were the only people in attendance at the appointed time. When Ms. Lockerby sought to enter a bid of $40,000, Mr. Leith, who knew what the Plaintiff's bid was going to be, told her that would be insufficient, and he told her what the Plaintiff's bid was. She persisted in seeking to enter her bid of $40,000.[2] She submitted her deposit check and her bid, which he ultimately accepted, but he did not declare a winning bid. Rather, he told Ms. Lockerby that her bid would be considered and she would hear back.

---

[2]12 V.S.A. § 4953(c) provides that "Any person may bid at the sale. All bidders, except for the mortgagee plaintiff or designee, shall meet the requirements set forth in the notice of sale in order to bid at the sale." She met the requirements.

12 V.S.A. § 4954(a), entitled "Procedure following sale," provides that "[f]ollowing the sale, the plaintiff shall file with the court a report on oath of the sale, together with a request for confirmation of the sale, which shall include an accounting of the sale proceeds, and a proposed order confirming the sale."

Plaintiff did not file a report of sale. No information was filed with the court about what had occurred at the time of the scheduled sale. If a "report on oath of the sale" had been filed with the court as required by law, it would have included the fact that there was only one bidder at the sale and that she bid $40,000 and met the requirements set forth in the notice of sale. It might also have included something about the auctioneer's confusion about whether he was or was not authorized to and did or did not enter a bid on behalf of the Plaintiff. From his testimony, the court finds that he did not actually enter a bid on behalf of the Plaintiff at the time of sale. Instead, his comment to Ms. Lockerby indicates that he intended to defer to Plaintiff's counsel about what would happen next.

Instead of filing a report of sale, almost two months later, Plaintiff filed the Motion to Void the Foreclosure Sale Held on December 8, 2016 and to Enlarge Time to Conduct Sale, which is the motion now under consideration.

In the motion, Plaintiff sought permission to conduct a new sale based on the failure of its representative to be present because she could not find the property. Plaintiff's counsel also notes that the auctioneer proceeded without the Plaintiff's representative and bid on behalf of the Plaintiff "without the express instruction to do so." Attached to the motion is an affidavit from the auctioneer, although it appears to have been prepared by Plaintiff's counsel and the court is aware that it is a frequent practice that Plaintiff's counsel prepares affidavits for auctioneers to sign. In it, he states that he "proceeded with the auction and placed a bid on Plaintiff's behalf without contacting Plaintiff's counsel's office." He leaves out the fact that Ms. Lockerby was present and submitted a bid, and that he told her that her bid would be considered. Nowhere in the motion or attachments is the court informed that there was another person at the judicial sale who entered a bid. Thus, Plaintiff was seeking to void the sale and be able to conduct a new sale without disclosing all the facts about what occurred at the sale that was held.

The court scheduled the motion for hearing, which was held on April 10, 2017. At that hearing, the court learned for the first time that there had been a bidder at the sale who had entered a bid, although Plaintiff's counsel did not know the person's name. The court required that person to be given notice of the motion and an opportunity to participate. The hearing was continued to May 11, 2017. Ms. Lockerby was somehow identified and given notice. Through her attorney, John P. Riley, she filed a Motion to Intervene and participated at the continued hearing on May 11, 2017.

At the hearing, Plaintiff's counsel argued that the sale should be voided and a new sale held on two grounds: that the failure of its representative to attend was due to "excusable neglect," and that because Ms. Lockerby's bid was only one-third of the bid

4

the Plaintiff intended to enter ($120,000 was roughly the redemption amount at the time of the originally scheduled sale in August of 2016 and the amount of Plaintiff's intended bid in December of 2016), the "low bid-to-debt ratio" of her bid, if successful, would result in the Plaintiff suffering a forfeiture. Ms. Lockerby's attorney argued that she had met all the requirements and was the only successful bidder at a duly held sale and that sale to her should be confirmed. The court denied the Plaintiff's motion for a new sale, confirmed the sale to Ms. Lockerby, and denied with prejudice any deficiency claim against the mortgagors. Plaintiff appealed, resulting in the Vermont Supreme Court Decision of July 27, 2018.

On June 26, 2018, when the case was pending before the Supreme Court and prior to the issuance of a decision, the Town noticed a Tax Sale of the property for August 9, 2018. Apparently, taxes on the property had not been paid for some time although Plaintiff's affidavit dated August 13, 2015 showed that Plaintiff paid taxes in 2014 and 2015. The Vermont Supreme Court issued its Decision on July 27, 2018 in which it remanded the case in a manner that provided Plaintiff a further opportunity to seek to hold a new sale at which it could enter a bid. When the Decision was issued, there was still over a week prior to the tax sale, but the Plaintiff did not pay the taxes. The day before the tax sale, Ms. Lockerby checked with the Town and learned that the taxes still had not been paid. That day, August 8, 2018, Ms. Lockerby paid the taxes due in the amount of $5,102.00. This avoided the tax sale and preserved the interests of all parties in the property.

Following the Supreme Court decision, the court scheduled a status conference to prepare for the remand. Based on the instructions from the Supreme Court to "weigh the equities" as they related to all concerned, this court required notice and opportunity to be heard to be given to the original mortgagors, Seamus O'Kelly and Jennifer O'Kelly. Both were served with the Supreme Court Opinion, the Motion and an Entry Order from the court, a Notice of Hearing, and a Notice of Appearance form. Seamus O'Kelly filed an appearance and participated in the continued hearing on the motion on February 14, 2019. Jennifer O'Kelly did not.

Following the remand and prior to the continued hearing, Plaintiff hired an appraiser to do an appraisal of the property. The appraisal was done November 1, 2018 and was retrospective to December 8, 2016, the date of the judicial sale at issue. The appraiser valued the property at $122,000 as of December 8, 2016 based on an analysis of sales of other properties that sold in 2016. Although he had visited the property on November 1, 2018, and been inside, there was no power on when he was there. He acknowledged in his testimony on February 14, 2019 that he did not know the condition of the property on December 8, 2016 with respect to the water supply, septic system, or roof. The court finds that his inspection of the property was cursory and not sufficient to make credible, reliable market adjustments from the other sales to support his valuation based on the sales approach. He did not have knowledge of the functionality of basic systems that might have been important factors for market purchasers.

The record shows that Plaintiff had obtained an appraisal in July of 2016. It is

5

unknown why that evidence was not presented to the court.  Instead, Plaintiff relied on an appraisal made two years later when the appraiser was unable to determine with accuracy the condition of the premises on the sale date, which was two years earlier.  The value was remarkably close to the amount of the bid that the Plaintiff wanted to make based on the debt.  While the court does not rule out the possibility that the property was worth $122,000 as of December 8, 2016, taking all of the circumstances into account, including the credible testimony of Ms. Lockerby and the fact that the Plaintiff acknowledges that there had been damage to the property sufficient to warrant an insurance claim and property preservation expense listed in the 2015 affidavit, and that bidders were not allowed to inspect the property, the Plaintiff has not proved that the value of the property on December 8, 2016 was $122,000.  Its fair market value as of that date is unknown.

The record shows that the original mortgage loan was guaranteed by the Veterans' Administration.  No evidence was presented to the court as to what the actual shortfall might be to Plaintiff once all factors are taken into account, including any benefits available through the VA guarantee or other accounting or tax ramifications.[3]

## Conclusions of Law

Plaintiff's argument before the Supreme Court that the Court deemed preserved was that the trial court had discretion to decline to confirm the sale to Ms. Lockerby.[4]  Plaintiff, in the trial court and on appeal, argued that Plaintiff's representative's failure to appear at the sale was due to excusable neglect and that Ms. Lockerby's bid was not commercially reasonable.  The Court determined that this court "effectively withheld its discretion by declining to weigh the equities implicated by the sale."  The Court

---

[3] While such factors may not be relevant in determining the amount unpaid on a mortgage obligation, as set forth below, the issue before the court is one of weighing the equities between the parties.

[4] The Court determined that there was one issue argued by Plaintiff that was not preserved.  Plaintiff had sent a representative to the auction to enter a bid on its behalf in conformance with the trial court decision of *Bank of N.Y. Mellon v. Campbell*, Nos. 229–4–10 Wrcv, 78–2–12 Wrcv, 568–10–11 Wrcv, 319–5–12 Wrcv, 2013 WL 6631044 (Vt. Super. Ct. Dec. 2, 2013) (concluding that it is improper for the auctioneer to enter bids on the mortgagee's behalf).  The *Campbell* ruling was noted in *HSBC Bank* but was not before the court for review in that case.  *HSBC Bank USA N.A. v. McAllister,* 2018 VT 9, ¶ 9 n.2 ("As mentioned above, the superior court adopted *Campbell*. This issue is not before us today; we need not determine if this Court would do the same and adopt the rules laid out in *Campbell*.").  Plaintiff briefed the *Campbell* issue on review of this case but had failed to present the issue to the trial court or otherwise preserve it for review, and for those reasons the Court declined to address it in this case.  *Bank of America, N.A. v. O'Kelly*, 2018 VT 71, ¶¶ 6–9.  In any event, there is no *Campbell* issue in this case because the court has found that the auctioneer, regardless of what Plaintiff may have intended him to do, did not enter a bid on Plaintiff's behalf.

referenced its decision in *HBSC Bank USA N.A. v. McAllister*, 2018 VT 9, a decision issued after the May 2017 denial of the Plaintiff's Motion to Void Sale in this case.

The *HBSC Bank* Opinion and the Opinion of the Supreme Court in this case provide helpful guidance to trial courts considering whether to confirm a sale. Specifically, in this case the Supreme Court has directed trial courts considering whether to confirm a sale to exercise discretion and "weigh the equities," *Id*., 2018 VT9, ¶ 11, as follows:

> ¶ 14. *HBSC Bank* dictates that a trial court fails to exercise its discretion where it does not consider factors relevant to the statutorily mandated procedural requirements of a foreclosure sale, any requirements set out in the foreclosure judgment, and other factors implicating the fairness or integrity of the foreclosure sale. *HBSC Bank* also stands for the proposition that a trial court may consider the commercial reasonableness of a bid as part of the court's consideration of whether to confirm a foreclosure sale when other evidence calls into question the integrity of the sale. The trial court's decision in *HBSC Bank* rested, in part, on inequity to the mortgagor as a result of the low bid placed on the foreclosed property, which would, because the bank in that case had not waived the deficiency judgment, result in a large remaining debt for the mortgagor. The court's decision [to order a new sale] was based on the presence of several factors that the court found potentially inequitable, including the effect of the low bid on the parties.

> ¶ 15. . . . [W]e now make explicit what was implicit in *HBSC Bank*— commercial reasonableness may be a factor where there is other evidence that suggests that a sale "was [not] conducted with fairness and in accordance with the legal requirements." . . . . A foreclosure action, even when by sale, remains an equity action, and the court has the power to refuse to confirm a sale where the result would be inequitable." Reporter's Notes—1982 Amendment, V.R.C.P. 80.1. Accordingly, where evidence suggests that the integrity of a sale may be undermined, commercial reasonableness may be an appropriate factor for the trial court's consideration.

> ¶ 16. . . . Here, it appears that the trial court declined to exercise its discretion—instead confirming the foreclosure sale in favor of the in-person bidder without considering whether circumstances of the auction compromised its fairness. . . . . We accordingly remand for the trial court to exercise its discretion in confirming, or not confirming, the sale, including consideration of whether the foreclosure sale satisfied statutory requirements and other factors relevant to the integrity and fairness of the sale.

*Bank of America, N.A. v. O'Kelly*, 2018 VT 71, ¶¶ 14–16.

7

*Plaintiff's Claim of Irregularities in the Conduct of the Sale*

There were no irregularities in the conduct of the auction up through the time of bidding. The procedure did not violate any statutory terms or express requirements in the foreclosure statute or order. The only irregularities were (1) the auctioneer's decision, upon receiving Ms. Lockerby's bid, to decline to act on it and instead consult Plaintiff for further direction, and (2) Plaintiff's decision to intervene after the fact, interrupt the filing of a statutorily required report of sale, and seek a do-over without notice to the one proper bidder at the sale. While irregularities in a sale might often reasonably call for a sale to be redone, these "irregularities" occurred after the auction itself and do not weigh in favor of a new auction for the reasons set forth in more detail below. Nonetheless, the Plaintiff's arguments are addressed as follows:

(a) *Excusable neglect.*
The failure of Plaintiff's representative to attend the auction and place its bid is not an irregularity in the sale. Any bidder can make a mistake in arriving at the right place at the right time and miss a scheduled sale. That does not implicate the validity of the procedure of the sale. While a mortgagee has a right to bid and enjoys certain advantages over other bidders pursuant to 12 V.S.A. § 4966 (d) based on its interest in the property (for example it is not required to make a cash deposit), it does not have an enhanced right to be present that would call for a second auction if its representative fails to attend the duly noticed auction. There has been no showing that the representative's absence was due to excusable neglect. Any neglect stemmed from "factors totally within the control" of Plaintiff and its agent. *In re Town of Killington*, 2003 VT 87A, ¶ 17, 176 Vt. 60. Plaintiff's agent simply did not know where the property was, was not properly equipped to find it, and did not budget enough time to deal with any difficulties finding the property. Courts take an "appropriately hard line" with this type of self-imposed neglect. *Id.* It is simply not excusable in the legal sense. Nothing extrinsic substantially contributed to the representative's failure to find the property on time. Both the auctioneer and the appraiser found it, and the auctioneer was on time.

(b) *Commercial reasonableness of Ms. Lockerby's bid.*
The facts do not show that the amount of Ms. Lockerby's bid produces an unconscionable windfall or is commercially unreasonable in any other sense. Plaintiff argues that Ms. Lockerby's bid is obviously unreasonably low in relation to the outstanding debt for which the property is security. A bid-to-debt ratio is not the relevant standard in the context of the type of auction the Plaintiff arranged. It was not designed to maximize market exposure in an attempt to solicit high bids. There was no evidence that there was anything other than the legal notice in a newspaper. Moreover, at any auction, bidders have no obligation to tailor their bids for the benefit of the secured party by mirroring the amount of debt.

At the hearing following remand, Plaintiff attempted to show that Ms. Lockerby's bid was low in relation to property value. However, the findings show that Plaintiff

8

failed in its attempt to show that the property was worth $122,000 at the time of the auction. Moreover, at that time, the property had sat unoccupied and unmaintained for a protracted period. Any bidder, not just Ms. Lockerby, could reasonably presume that the property may have suffered substantial damage due to abandonment and neglect, and the rules of the auction did *not* permit bidders to inspect the property to assuage any such concerns if the property in fact was not significantly damaged.

Thus, any reasonable bidder, with such knowledge and without an ability to check the interior of the house, had to assume there was a risk of actual property damage in addition to deferred maintenance and take that into account in formulating a bid. As the findings show, the record does not support a conclusion that a sale price of $40,000 (Ms. Lockerby's bid) was commercially unreasonable under the circumstances. This is unlike the situation in *HSBC*, in which the bidder was the mortgagor, who had full knowledge of the condition of the property and made what was clearly a nominal bid.

Plaintiff's retrospective indication of a willingness to make a bid higher than Ms. Lockerby's is not a basis to conclude that a timely bid was not commercially reasonable in context. If a showing that a person or entity, not present when the auction occurred, later would pay a higher price, few auction sales could ever be confirmed as the search for higher bids could be endless.

*Other equitable concerns—Plaintiff*

While a secured party generally has contracted to receive the value of the security as a credit against the debt, the remedy of foreclosure is an equitable one, and equity does not favor Plaintiff in this case insofar as it seeks to erase the effects of its mistake with respect to the December 2016 auction and conduct a new one. First, it is unclear from the outset whether Plaintiff stands to suffer any loss on the underlying debt, or to what extent. The record shows that the loan was guaranteed by the Veterans Administration and that there may have been an insurance recovery. Importantly, no witness testified for Plaintiff as to any actual amount of financial shortfall that it would incur as a result of actions not attributable to itself. Plaintiff simply did not prove a forfeiture.

Moreover, Plaintiff chose to have a no-frills auction that, in the circumstances, was never reasonably calculated to maximize the sales price. Plaintiff left the property in an abandoned state prior to the auction for a protracted time, which would reasonably be presumed to harm it and decrease its value. It looked obviously uncared for. Bidders were not allowed to inspect the property prior to bidding. Under those circumstances, it is predictable that a member of the public would make a bid that reflected risk. While Plaintiff may have intended to eliminate an independent bidder by making a debt-level bid through its own representative, it missed the opportunity to do so.

When Plaintiff sought to void the auction, it attempted to do so unfairly by giving no notice to Ms. Lockerby, whose check it held, and by failing to inform the court that she existed as a qualified bidder who entered a proper bid at the sale. Once the court required that she be notified of the motion, in seeking to eliminate her from contention as

a bidder, Plaintiff arranged for an after-the-fact retrospective appraisal and gave the appraiser access to the interior of the house, when such access had not been available to Ms. Lockerby at the time of the auction or later, and she had had to bid based on unknown factors with significant indication of likely damage.

If Plaintiff truly believed that the property was worth less than the debt, it could have sought strict foreclosure rather than a judicial sale. If it believed that the property was worth as much as the debt, it could have taken steps to maintain and prepare the property for sale, advertise it more effectively, and employ an auction format more likely to encourage higher bids to maximize sale proceeds. Plaintiff did neither.

Instead, in response to the outcome of the auction, it interfered with the auctioneer's responsibility to report to the court what occurred at the judicial sale. Furthermore, in seeking a new sale, it failed to fulfill its own statutory obligation to report to the court what occurred at the time of sale, and instead attempted to eliminate the effect of the sale by getting court authority to void it and conduct a new one. It seeks an opportunity to have another sale held at which it could presumably make a debt-level bid higher than Ms. Lockerby's and acquire the property.

In failing to inform the court that a valid bid had been submitted at the auction, it violated both its statutory duty and an obligation of candor to the court, which must be considered inherent in an equitable proceeding. Plaintiff also stopped paying property taxes and allowed the property to go to a tax sale, which would have occurred but for Ms. Lockerby proactively paying the taxes. This occurred at the same time that Plaintiff was seeking through legal process to eliminate her claim to the property and obtain it for itself. In short, Plaintiff comes to the court with unclean hands in seeking an order permitting it to redo the auction. The equities do not favor Plaintiff.

### Other equitable concerns—Seamus O'Kelly and Jennifer O'Kelly

Seamus O'Kelly and Jennifer O'Kelly both defaulted in the foreclosure action. They gave up the opportunity to participate in the process. They did not pursue maintenance and preservation of the property and for auction terms that would have been better calculated to maximize the sales price, nor did they seek to protect themselves from the effects of deficiency debt. They are no different than many foreclosure defendants.

As far as maximizing the value of the security at the sale goes, their interest in maximizing value should have been aligned with Plaintiff's. Both should have had the same interest in obtaining the highest possible sales price for the property so that a sale would have covered as much of the debt as possible. As laypersons and defendants to the foreclosure action who presumably were under financial distress, it is understandable (however unwise) that Mr. O'Kelly and Ms. O'Kelly would choose to not participate and leave the process to a major national banking institution. However, they might reasonably have assumed that such an institution would act in a manner that maximized the value it could obtain from the property. While they did not act to help themselves,

10

Plaintiff's failure to protect property value and maximize the sale price prejudiced the O'Kellys' financial interests as well as its own.

*Other equitable concerns—Ms. Lockerby*

Equity strongly favors Ms. Lockerby. She followed all the rules. She investigated the property to the extent possible under the circumstances. She arrived to bid twice at the appointed time and place. She met all requirements for making a bid, and she took the extraordinary step of insisting that the reluctant auctioneer do his job properly and accept her bid. Moreover, even with no other participating bidders present, she made a bid that had a reasonable basis in unknown risk and was not simply a nominal bid designed to get a windfall. She paid over $5,000 in property taxes to preserve the availability of the property for the Plaintiff as well as herself. For its part, Plaintiff sought to void the sale in a manner designed to deprive her of notice.

Ms. Lockerby was not a party to the foreclosure action prior to judgment. However, as a participating member of the public qualified to bid at the public sale, and in fact having submitted the highest bid, she was entitled to be taken seriously and treated fairly. The auctioneer hired by Plaintiff did not properly honor her legal right at the public sale until she insisted, and the Plaintiff seriously mistreated her by ignoring her valid interest in the legal process following the sale. A second public sale now would singularly benefit Plaintiff, who has unclean hands but would likely bid at least $120,000, and unfairly penalize Ms. Lockerby, who followed all the rules and then had to incur the extraordinary expense of hiring a lawyer just to be treated fairly. Such an outcome would send the wrong message to the public, as members of the public might reasonably interpret it to mean that the foreclosure sale process is a sham that can be manipulated by banks to produce the outcomes they prefer.

*Deficiency claim against Mr. O'Kelly and Ms. O'Kelly*

The original confirmation order expressly stated that any deficiency claim against Mr. O'Kelly and Ms. O'Kelly was denied "with prejudice." See Confirmation Order 2 (filed July 17, 2017). There is no indication that Plaintiff raised the deficiency issue on appeal. Certainly the Court did not address it. The denial of Plaintiff's deficiency claim now is final because Plaintiff failed to challenge that ruling on appeal.

If only by way of elaboration, however, the court notes that the difference between the sales price and the remaining debt is properly absorbed by Plaintiff in this case. Plaintiff, in possession of the residence, did not maintain the property prior to the sale and thus it can reasonably be expected to have significantly lost value. It then commissioned a bare-bones auction in which bidders were not permitted to fully inspect the property and thus were unable to arrive at rational understandings of market value under circumstances in which they had to infer that they could face unknown but significant rehabilitation expenses, reasonably inducing any rational bidder to err on the downside.

11

It has long been the law in Vermont that when a secured creditor does not treat debtors fairly in selling the collateral, the consequence is that the creditor is barred from recovering a deficiency. See *Federal Financial Co. v. Papadopoulos*, 168 Vt. 621, 624 (1998) (commercially unreasonable liquidation of security bars deficiency claim; absolute bar rule is simple and certain and gives creditors incentive to comply with legal requirements); *Chittenden Trust Co. v. Andre Noel Sports,* 159 Vt. 387 (1992) (failure to give notice of sale of collateral bars recovery of deficiency). Plaintiff must live with the deficiency that it exacerbated.

*Summary*

Having weighed the equities, the court concludes that Plaintiff has acted with unclean hands in several ways as described above. With respect to its request to void the December 2016 sale and hold another one, the equities clearly weigh against doing so and in favor of confirming the property to Ms. Lockerby. In addition, there is a public interest in *not* holding a second sale under the circumstances of this particular case. Due to Plaintiff's failure to fairly attempt to maximize the value of the security, case law and equity favor barring recovery of any deficiency.

Mortgagees such as Plaintiff are in the business of making mortgage loans and it is inherent in such a business that they seek the legal remedy of foreclosure, including foreclosure by judicial sale, under circumstances of default. They process large numbers of cases and most of the time, they follow the procedures correctly. If they do not, however, and the facts of a particular case show that the equities favor another party with an interest in the proceeding, plaintiffs are not entitled to court remedies that overlook missteps in protecting their interests. In this case, Plaintiff has not shown grounds for the relief it seeks, as the foregoing weighing of the equities shows.

### *Order*

Plaintiff's Motion to Void Foreclosure Sale is denied. The Confirmation Order filed on July 17, 2017 is reinstated without modification. Plaintiff is not entitled to any interest or other costs and expenses incurred after December 8, 2016.

Dated this 6th day of May, 2019.

_____
Hon. Mary Miles Teachout
Superior Judge

12